Argued 28 March; decided 30 April, 1898.

## FIRST NATIONAL BANK *v.* COMMERCIAL ASSURANCE COMPANY.

## SAME *v.* PHŒNIX ASSURANCE COMPANY.

[52 Pac. 1052]

1. IMPEACHMENT OF WITNESS—EVIDENCE OF REPUTATION.—An attempt to show on cross-examination that a witness has at other times made statements not in harmony with his testimony on the trial is not such an impeachment of his character as to let in proof of his general reputation for truth and veracity: *Sheppard* v. *Yocum*, 10 Or. 402, cited.

2. FOUNDATION FOR IMPEACHMENT.—An attempt on cross-examination to show by former declarations that a witness is corrupt is not a sufficient foundation on which to admit testimony of his good reputation for truth and veracity: *Sheppard* v. *Yocum*, 10 Or. 402, cited.

3. TRIAL—PRESUMPTION OF INNOCENCE OF CRIME.—Where the defense to an action on an insurance policy is that the property was intentionally burned, it is proper to charge the jury that the person charged with the crime is presumably innocent, and that such presumption should be considered in arriving at a verdict. This is not a legal presumption, but rather a natural presumption of fact arising from the experience of mankind that probably people will not commit criminal acts.

4. INSTRUCTION—PROVINCE OF JURY.—In an action on an insurance policy, where defendant accused insured of destroying the property, instructing the jury to consider the improbability that one will commit such an act as an element necessarily involved, does not invade the province of the jury.

5. EVIDENCE INCONSISTENT WITH THEORY OF CASE.—In an action upon an insurance policy where the defense is that the fire was incendiary by the procurement of the insured, testimony that one in the insured's employ was reputed to be an incendiary is inadmissible as too remote where the case was not tried upon a theory consistent with such employee's agency in causing the fire.

From Multnomah : ALFRED F. SEARS, Judge.

Separate actions by the First National Bank of Portland against the Commercial Union Assurance Company, and the Phœnix Assurance Company. The two actions were tried together and plaintiff had judgment. Defendants appeal.

AFFIRMED.

For appellants there was a brief over the name of *Cox,
Cotton, Teal & Minor,* with an oral argument by *Mr. Wil-
liam W. Cotton.*

*c* For respondent there was a brief over the names of
*Henry E. McGinn* and *Dolph, Mallory & Simon,* with an
oral argument by *Mr. McGinn.*

Opinion by MR. JUSTICE WOLVERTON.

These are actions to recover upon certain policies of
insurance against loss or damage by fire, assigned to
plaintiff by H. Wolf & Brother, a firm composed of H.
Wolf and Marcus Wolf, who were the assured under the
policies; and both actions, being for losses by the same
fire, were tried together in the court below. The sole
defense interposed is that the said H. Wolf and Marcus
Wolf did willfully, wrongfully and fraudulently set, and
cause and procure to be set, fire to the property covered
by said policy of insurance, whereby the same was
burned, damaged and destroyed. The defendants, hav-
ing the burden of proof, were permitted to open and
close both with their proofs and argument at the trial.
The order in which such proof was introduced does not
clearly appear from the bill of exceptions, but it does
appear that evidence was offered tending to show that
the fire was of incendiary origin. Among the witnesses
called was John Zimmerlee, who testified, among other
things, that he resided at Woodburn, Oregon; that he
was in Portland with one Mitchell on July 20, 1896;
that, being near by, they saw a man open the door and
come out of the store of H. Wolf & Brother, and that a
puff of smoke came out as he did; that he shut the door
with his right hand, looking directly over his shoulder,
and then ran diagonally across the street; that witness

saw the face of the man when he turned his head; that, when the man first came out of the building, Mitchell said, "Look at your watch, there may be something in that," and witness looked, and it was eight minutes after six o'clock, and that his watch was set by the clock on the Oregonian Building; that the fire soon burst out of the building, and witness and Mitchell waited until the fire companies arrived; that on the following morning, between eight and nine o'clock, witness went to the building, and saw a man there who looked to him the same as the one whom he saw coming out of the building the night before, and identified him as Jacob Wolf, the son of H. Wolf, one of the parties insured; and that afterwards he saw Jacob Wolf, and recognized him, in another store occupied by H. Wolf. The witness was rigidly cross-examined, and, among other testimony, the following was adduced: "Q. Do you remember Mr. Wilkins, who was in this court on the former trial of the case? A. Yes, sir. Q. Did you speak to him, or did Mitchell speak to him in your presence on the night of the fire? A. I could not say whether he did or not. I don't recollect that he did. I recollect afterwards that Mitchell introduced me to him. Q. Didn't you, in the presence of the said Wilkins, and in the presence of the said Mitchell, no one else being present, state to him the full facts and circumstances, omitting to make mention of having seen any man come out of the store, or having seen any man cross the street, or having seen anything of the kind? A. I don't recollect that I spoke to him. I don't recollect seeing the man that night at all. Q. Did you go over to Mr. Wilkins' hotel on the east side of the river? A. Yes, sir. Q. Did you have a conversation with Mr. Wilkins there relative to the fire? A. Yes, sir. Q. I will ask you if you did not say to Mr. Wilkins at his hotel, some little time after the fire,—the exact

time I do not now remember,—when yourself and Mitchell and Wilkins and no one else was present, something like, 'These are all the facts in the case. We want you to take this matter, and work it up for us'; and on his making the following answer to you, 'All that you know don't make any case; there is nothing to be worked up,' you said, 'Well, there is, and we just want you to make what you can out of it,' or words to that effect? A. No, sir. Q. I will ask you if you did not state to John O'Neill, in the city of Portland, on or about the twenty-first day of June, 1896, on Fourth street, in this city, at a point where O'Neill was engaged in putting down some of these blocks, etc., * * * 'I saw the Wolf fire, but I could not identify the man I saw coming away from there,' or words to that effect? A. I told him I saw the Wolf fire. Q. Did you say anything like that? A. No, sir. Q. I will ask you if you did not say to John Manning, who lives at Woodburn, Marion County, Oregon, in the latter part of July, or early part of August, 1896, 'John, take this case and work it up for me. You ought to get a thousand dollars out of the insurance company for what I know,' or words to that effect? A. No, sir. * * * I spoke to Mr. Manning, and told him that Mitchell had went to Hough and employed him as an attorney to look the matter up without any consent of mine whatever; and I asked Mr. Manning when he was going to Portland. He said he would go down in a few days. Said I, 'If you have time I wish you would go to the insurance company and see what they have done,' and find out, if he could, what they had done. Q. In what way? A. If they had made any arrangement or anything. Q. What next did you do? A. Then I went to John Poorman and told Mr. Poorman the facts, or partially so. I don't know as I told him everything. I told him I had valuable evidence for the

insurance company, and said : ' You go to Portland ; you are in the insurance business ; and find out what the insurance company will do, and tell them I have evidence I think is valuable to them, and that I am at their disposal.' '' After the examination of the witness Zimmerlee, and before the plaintiff had opened its case, the defendants called as a witness W. L. Tooze, who was a citizen and resident of the town of Woodburn, for the purpose of establishing the good reputation of Zimmerlee for integrity, truth and veracity in the community in which he lived. Objection was made to the introduction of such testimony as irrelevant and incompetent, which objection was sustained by the court. This ruling is assigned as error, and constitutes the chief ground relied upon for a reversal of the judgment.

1. The defendants' contention is that the method pursued in the cross-examination of Zimmerlee, and the matters adduced by it, constitute such an impeachment of his character as to let in proof of his general reputation for truth and veracity in the community in which he lived. Two methods of impeachment are involved in the cross-examination. One was an apparent effort to show that the witness had made statements out of court not in harmony with his testimony, and the other an attempt to connect him with a scheme to barter his testimony to the insurance company, which it is claimed, if true, involves him in a crime which would render him unworthy of belief. The questions put touching his supposed conversations with Mitchell, Wilkins and O'Neil, wherein he omitted to make mention of having seen a man come out of the store and run across the street, are of the first. If the case had gone further, and these persons had been called and testified to the supposed contradictory statements, then the case would have been identical with

*Sheppard* v. *Yocum*, 10 Or. 402–413, wherein it was held that the proper foundation had not been laid for sustaining the witness by proof of his reputation for truth and veracity. That cause was well considered, and overruled the earlier case of *Glaze* v. *Whitley*, 5 Or. 166 ; so the question must now be regarded as settled, against the defendants' contention, on this phase of the controversy.

The second method adopted calls for a more extended inquiry, as the exact question involved has not yet received the consideration of this court. It concerns the question put to the witness touching his conversations with Wilkins and Manning relative to his knowledge of certain facts bearing upon the case, and the amount of money that the insurance company ought to pay for what he knew. The witness denied having made the statements as recited to him, but he admits having said to Manning, " I wish you would go to the insurance company, and see what they have done," and to John Poorman, " You go to Portland ; you are in the insurance business ; and find out what the company will do, and tell them I have evidence I think is valuable to them, and that I am at their disposal." The statute provides that evidence of the good character of a witness in any action, suit or proceeding is not admissible until the character of such witness has been impeached : Section 842, Hill's Ann. Laws. This provision is but declaratory of the common-law rule which prevailed prior to its enactment. A witness may be impeached by evidence that his moral character is such as to render him unworthy of belief, but not by evidence of particular wrongful acts, except that it may be shown, by the examination of the witness or the record of the judgment, that he has been convicted of a crime : Section 840, Hill's Ann. Laws. If, however, the question as to whether he has been guilty of a crime or other moral turpitude becomes a legitimate subject of

inquiry on the trial, his reputation for truth and veracity may be proved to rebut any imputations against his credit which the evidence of guilt makes against him.

In *Webb* v. *State*, 29 Ohio St. 351, defendant, who was charged with forgery, while a witness in his own behalf, gave evidence tending to show that he did not forge or utter the contract described in the indictment, but that he procured it from one Frank W. Hill, without knowledge of its true character, and produced other evidence tending to show that Hill had told divers persons that he (Hill) was managing the case, and running it sharp; that he had attempted to intimidate certain of defendants' witnesses, and had forged said contract himself. So, it was held that the witness' general character was involved in the controversy, and that it was proper to sustain him by evidence of his good reputation for truth and veracity : *Tedens* v. *Schumers*, 14 Ill App. 608, is also cited to the same point, and supports the doctrine.   The plaintiff sued upon a duebill, and defendants pleaded accord and satisfaction by reason of plaintiff's theft of goods from their store while in their employ as clerk, and alleged that he admitted the theft, and agreed that the duebill should be surrendered in satisfaction of the goods stolen. Witnesses were produced, who gave evidence in support of the allegations of the answer ; and it was held that it was such an attack upon the character of the plaintiff as that it laid a foundation for the introduction by him of proofs of his good character for truth.   But the judgment was reversed by the supreme court (112 Ill. 263), which held that the facts of the case did not warrant the invocation of the rule, because it was thought the general character of the plaintiff had not been assailed ; and it was observed that "mere contradictions, or different versions by witnesses, do not justify the rule that he may

call witnesses to support his character for truth.    *    *    *
Before he can do so, his general character must be at-
attacked.'' The rule is stated in *Vernon* v. *Tucker*, 30 Md.
456–462, thus :  '' Where the character of the witness is
impeached by matter brought out on the cross-examina-
tion, or by evidence aliunde as to character, the witness
may be sustained by evidence of good character ; but it
must, in either case, amount to an impeachment of the
character of the witness for truth.''   To the same effect,
see 29 Am. & Eng. Enc. Law ( 1st ed ), 821.

It is urged that the cross-examination of Zimmerlee
was an effectual attack upon and an impeachment of his
general character, and the rule here alluded to is invoked
to sustain the proffer of evidence to show that his repu-
tation for truth was good in the community in which he
lived.   We are convinced, however, that the attempted
impeachment is not of the character claimed for it, and
that, instead of going to the witness' general character
for honesty and probity, it goes rather to the credibility of
his testimony, and was calculated to affect its weight in
the estimation of the jury.   The matters which it is ap-
parent the examiner sought to elicit by the cross-inter-
rogatories alluded to would, if adduced, tend rather to
show the bias of the witness towards the parties concerned.
In this view the testimony was not collateral to the issue.
It is legitimate to show on cross-examination the bias of
a witness by his own statements made elsewhere, but, as
a general rule, in an impeachment of this nature, a
foundation must be laid, and the attention of the witness
called to the time and place of the declarations showing
bias : Underhill's Ev. § 354, and note 2 at p. 523 ; Brad-
ner, Ev. § 19, p. 21.   See, also, *Newcomb* v. *State*, 37 Miss.
383–402 ; Queen's Case. 2 Brod. & B. 284 ; *Bates* v. *Hol-
laday*, 31 Mo. App. 162 ; *Consaul* v. *Sheldon*, 35 Neb. 247–
254, (52 N. W. 1104) ; *Hamilton* v. *Manhattan Railway Co.*

(Super. N. Y.), 9 N. Y. Supp. 313 ; *State* v. *McFarlain*, 41 La. Ann. 686 (6 South. 728) . The rule is similar to the one which requires that, before a party can be impeached by contradictory statements made out of court, his attention must be called to them, together with the time, place and persons present, which, if he denies or evades, may be established by other witnesses : *Baker* v. *Joseph*, 10 Cal. 173–178. In that case, BALDWIN, J., quotes from 2 Phillips, Ev. 435, as authoritative, as follows : " The rule that a witness ought to be cross-examined as to contradictory statements, before they can be admitted in evidence to impeach the credit of his testimony, has been extended, not only to contradictory statements, but also to other declarations of the witness, and to acts done by him through the medium of declarations or words ; so that, if it is intended to offer evidence of former declarations of a witness, or of acts done by him touching the cause, not with a view to contradict his statement upon oath, but for the purpose of discrediting him as a corrupt witness, or as one who would corrupt other witnesses, in this case also it has been determined that the witness should be previously questioned as to them in cross-examination." This brings the case of *Sheppard* v. *Yocum*, 10 Or. 402, by analogy, quite in line upon principle with this as it respects the second contention, and must be considered decisive of it also. If the question put to the witness touching the attempted barter of the knowledge he possesed of the burning of the stock of goods had been answered in the affirmative, then the cross-examination would have served its purpose ; but, having been denied or parried, it was competent to impeach his statements, for the purpose of establishing bias through the establishment of his alleged corrupt propositions to dispose of his testimony for a consideration. The effect of such testimony is to discredit the witness'

evidence, and not, in the legal sense, to impeach his general character, so as to let in testimony of his good reputation for truth and fair dealing.   There was no attempt, therefore, at impeachment by an attack upon the witness' general character, but the purpose of the cross-examination was to establish his bias towards the defendant in the action, and thereby to discredit his testimony with the jury; and the court committed no error in refusing to admit testimony of good reputation for truth and veracity.

2. It was urged with strong emphasis that very much depended upon the establishment of the witness' good character for truth and veracity and fair dealing, as the case turned upon the proper credit which should have been given to his testimony in the case; that what the witness testified to touching his solicitude that the company should have knowledge of what he would swear to was susceptible of two constructions,— one in harmony with an honest purpose, and the other the very reverse; and, if his good reputation had been established, it would probably have preponderated the cause in defendants' favor.   This may all have been true, but it does not afford the ground upon which the testimony offered is made admissible; and, unless the witness' general character is first assailed, there can be no proof admitted to establish it, as the law gives him one by presumption : *Hitchcock* v. *Moore,* 70 Mich. 112 ( 37 N. W. 914, 14 Am. St. Rep. 474).

3. The next question presented arises upon the following instructions to the jury :  " It is proper to say in this case that a natural presumption of innocence, where an act is charged of this nature, exists ; and you have a right to consider the improbability that one will commit an act of criminal nature as an element necessarily

involved.   This you may consider as you should every
material circumstance involved in the case ; but, after
viewing the whole case with such care as it demands,
your verdict should be in accordance with the testimony
and the proof.''   Two objections are urged :  ( 1 ) That it
treated the legal presumption of innocence as a circum-
stance to be weighed by the jury in determining whether
the defendant had established its defense by a prepon-
derance of the evidence ;  and ( 2 ) it invaded the province
of the jury by stating that the improbability that one
would commit a crime was a material circumstance to be
considered by them.

The presumption of innocence is one of law, made
statutory ;  but it belongs to the class which is denomi-
nated '' disputable presumptions.''   Under the rule of evi-
dence in civil cases, it unqualifiedly casts the burden of
proof on the party who stands against its operation.   It
differs but slightly from strong presumptions of fact, the
result of which is to compel the party who would dispel
them to produce testimony to alter the weight of the evi-
dence.   Where the former are disregarded by a jury, a
new trial will be granted as matter of right, but a disre-
gard of any of the latter, however strong or obvious, is
only ground for a new trial, at the discretion of the
court :   19 Am. & Eng. Enc. Law ( 1st ed.), 58, 61, and
Best, Ev. ( Am. ed.) §§ 323, 327.   Presumptions of fact
are the natural presumptions which rest upon experi-
ence and observation of the course of nature, the consti-
tution of the human mind, the springs of human action
and the usage and habits of society.   The presumptions
of law, many of them, rest upon the same ground which
the law simply recognizes and enforces.   Many of them,
however, are only partially approved by reason, and the
law from motives of policy attaches to the facts which
give to it an artificial effect beyond their natural ten-

dency to produce belief : Best, Ev. (Am. ed.) §§ 303, 305. Just so far as the presumption or maxim, as it may be termed where it does not proceed from proof, is founded upon reason and the experience of human kind, it has evidentiary value ; and, in the determination of such value, the artificial effect given it by the edict of law must be elminated,— that is to say, strike off the edict, and what is left will constitute a natural presumption, or one of fact, and this will be the measure of its evidentiary value.

Now, the court instructed the jury that a natural presumption of innocence existed in a charge of the nature under consideration, and assigned a reason for the presumption, viz., the improbability that a person will commit a criminal act. This was a logical presentation of the evidentiary value comprehended by the presumption for the consideration of the jury, which matter the court said the jury might consider as they would other material circumstances involved in the case. and that, upon the whole case, they should render a verdict in accordance with the testimony and the proof. It would seem that the instruction was technically and logically correct if such strictness and accuracy was necessary to sustain it, and it is in harmony with the authorities. Mr. Wharton says : " The better view is that in civil issues the result should follow the preponderance of evidence, even though the result imputes crime. Of course, as a factor in such a calculation is to be considered the presumption of innocence attachable to good character when character is unassailed." In *Hills* v. *Goodyear*, 4 Lea, 242 (40 Am. Rep. 5), the court say : "A mere preponderance, however slight, will still suffice to turn the scale ; but, to sustain a finding of crime, it must be a preponderance sufficient to outweigh the opposing evidence of good character, if any, and the presumption in favor of innocence.

The court should instruct the jury upon the legal effect of the evidence of character or presumption of innocence ; and it is the duty of the jury to weigh these elements in connection with the other proof, in arriving at a conclusion on which side the preponderance exists.''   PINNEY, J., in *Bachmeyer* v. *Mutual Association*, 87 Wis. 325 (58 N. W. 403), says : '' The question is one of fact for the jury, and the duty of the court is fully performed when it declares the existence of the presumption, and that it may be displaced or overcome by evidence in the case, the weight and effect of which is for their determination.''   In further support of the propriety of the instruction, see *Graves* v. *Colwell*, 90 Ill. 612 ; *Ellis* v. *Buzzell*, 60 Me. 209 (11 Am. Rep. 204) ; *Bradish* v. *Bliss*, 35 Vt. 326 ; *Mead* v. *Husted*, 52 Conn. 55 (52 Am. Rep. 554) ; *Jones* v. *Greaves*, 26 Ohio St. 6 (20 Am. Rep. 752) ; *Huchberger* v. *Merchant's Insurance Co.*, 4 Biss. 265 (Fed. Cas. No. 6,822) ; *Scott* v. *Home Insurance Co.*, 1 Dill. 105 (Fed. Cas. No. 12,533).

4. Nor does the instruction invade the province of the jury.   The improbability that one will commit an act of a criminal nature constitutes the basis for the natural presumption of innocence, and it was not a comment upon the testimony, nor can it be said that the court gave undue weight to the presumption by its manner of referring to it.   The cases cited by counsel for appellant in support of their contention are cases in which peculiar stress was laid upon the presumption, such as in *Bachmeyer* v. *Mutual Association*, 87 Wis. 325 (58 N. W. 399), wherein it was characterized as a strong one ; and in *Rothschild* v. *American Central Insurance Co.*, 62 Mo. 356, the attention of the jury was particulary called to the serious nature of the charge, thus giving undue promi-

nencè to the presumption. The alleged vice of the instruction therein corrected does not obtain here.

5. Another question arose in this manner : Evidence was introduced and admitted tending to show that the fire which damaged the stock was of incendiary origin, and there was an attempt to show that H. Wolf & Brother were responsible for it. The defendants called George Butler as a witness in their behalf, and desired to show by him that he was acquainted with the general reputation of one Henry Jacobs ; that, for a considerable time prior to the fire, H. Wolf & Brother had him in their employ in the store ; and that he was reputed to be a fire bug or incendiary. But the court refused to allow the introduction of the testimony, and the action of the court in this regard is assigned as error. This testimony was too remote, and could not serve under the exigencies of the case to connect H. Wolf & Brother with the inception of the fire which caused the damage. The case was not tried upon a theory consistent with Jacobs' agency in causing the fire, and is wholly disconnected with any matter tending to fix the responsibility upon H. Wolf & Brother. The judgment of the court below will be affirmed.

AFFIRMED.

Decided at PENDLETON 13 August, 1898.