No. 30,391.

CHARLES C. WALLACE, Administrator of the Estate of H. E. White, *Appellee*, v. FIDELITY PHŒNIX FIRE INSURANCE COMPANY, *Appellant*.

(9 P. 2d 621.)

Opinion filed April 9, 1932.

*Richard E. Bird*, of Wichita, for the appellant.

*E. J. Taggart, John W. Bradley*, both of Wellington, *W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *William E. Cunningham*, all of Arkansas City, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action brought by the administrator of a deceased owner of a stock of merchandise in the town of Belle Plaine to recover for the loss thereof by fire on a policy issued thereon to him by the defendant insurance company.

The answer of the defendant admitted the issuance of the policy and the occurrence of the fire, but alleged that the fire was caused by the owner, H. E. White, voluntarily, maliciously and intentionally setting it out to damage and partially destroy the goods for the

purpose of cheating and defrauding the defendant, and to recover the value thereof from the defendant insurance company. The reply was a general denial and a waiver of any claim under the policy beyond $2,995, interest, costs and reasonable attorney fee.

The jury rendered a verdict for plaintiff and answered a special question stating that the owner did not set fire to the property. Judgment was rendered thereon and the defendant appeals, urging error of the trial court in two particulars, viz., that the verdict and special finding are contrary to the evidence and in giving instruction number ten concerning the presumption of innocence.

The evidence shows that the owner committed suicide in a room over the main storeroom, during or about the time of the fire, by shooting himself. There was no controversy about the amount of the loss, proof of loss, appointment and authority of administrator and the demand for payment. The theory of the defendant is that the owner set out the fire in three places in the store, near the cash register along the west wall, near the southwest corner of the main storeroom and near the head of the stairs next to the rack of window shades, and that paint cans were opened and placed at two of these places. There was evidence of the embarrassing financial condition of the owner and his nervous attitude a few hours before the fire. About 1 o'clock in the night the deceased met the city marshal while it was raining very hard and told the marshal he had a leaky roof over the store and he was going down to see if it might be leaking through. He asked the marshal when he went off duty in the morning and was told between 5:30 and 6. He went into the bakery and got a cup of coffee, telling in there about his leaky roof. The night marshal and an employee of the bakery passed the store about 5:30 and saw no indications of fire, and the usual electric light or lights were burning. The fire was discovered about 5:40, or ten minutes after the marshal passed. It was not raining then, as the storm had ceased about 4 o'clock. Some of the books near the cash register were considerably burned and the safe door was closed but not locked. From this and other undisputed evidence in connection with the evidence about which there is some conflict, the appellant insists that the general verdict and the special finding of the jury are contrary to the evidence and that the trial court should have set aside the verdict and finding and granted the defendant a new trial, reasoning that it was a pure case of arson and that upon the discov-

ery of the fire before the conflagration was fully under way and fearing detection of his acts the assured owner took his own life. Appellant further urges that the theory of the appellee, which was accepted by the jury, was based upon mere conjecture and not upon substantial facts.

The theory of the plaintiff is that the fire originated in the woodwork above the metal ceiling and was caused by a "short" in the electric wire, brought about by lightning which also burned the telephone wires in two, destroyed the telephone instrument, and that the fire so caused had been developing for some time in the woodwork above the ceiling and was therefore not observed by the witnesses passing the store building between 5:30 and 5:40 a. m.

The evidence showed there had been a very severe thunder storm and pretty sharp lightning during the night and continuing until 3 or 4 a. m.; that the telephone wire in the building had been burned through in five places, where it entered the metal ceiling. The receiver cap was blown off. The telephone wires did not have a lightning arrester on this line. The wire was grounded to the cold-water pipes in the building. The electric light for the building was furnished by four or five drop lights from metal ceiling. It was all open wiring through the building. The knobs were tarnished, the fuse box was "blowed" and the brass ends were loose.

There was evidence showing that immediately after the discovery of the fire the main fire was in the southwest corner of the storeroom; that it appeared to be sweeping across the upper corner of the west wall; that the metal ceiling was red hot; some of it was hanging down; that the fire could be seen up under the ceiling; that the main part of the fire seemed to be in the joists above the middle ceiling along the west wall; that the window frame in the southwest corner was burned more at the top than the bottom; that goods on the upper shelf near the southwest corner were burned apparently from the top; that after the fire it was observed that several two-by-twelve joists in the rear of the storeroom were nearly burned through; that the fire near the cash register was comparatively slight and upstairs at the window-shade rack the worst burning seemed to be at the upper part rather than the lower; that there was a slanting roof over the back part of the storeroom to the ceiling of the second story over the stairway and window-shade rack.

The deceased was said to have been timid about fires, that there was nothing unusual about his actions at home the evening before

and that he had three years before the fire reduced the size of the policy on his stock of goods.

There was a conflict in the evidence as to some of the matters here enumerated, but the jury gave credence to the theory of the fire being caused by lightning rather than by arson and the trial court concurred, so that our sole and only duty is to determine if there was sufficient evidence to support such finding, and we think there was.

The lightning theory does not seem to us to be mere conjecture or surmise, as urged by appellant, but many of the features in support of it appear to be supported by cold facts that are not easily otherwise explained. Of course, the conclusion reached must not be based upon conjecture or surmise, but the facts of there being sharp lightning about two hours before the discovery of the fire, the blowing off of the telephone receiver cap, the burning in two of the telephone wire in several places, the red hot metal ceiling and the deeply burned joists as found immediately after the discovery of the fire, seem to be substantial and reasonable features sustaining the lightning theory, even against the unexplainable conduct of the deceased owner.

Appellant assigns error in the giving of the instruction on the presumption of innocence without qualifying it with an instruction that it was a legal presumption only and disappears where there is evidence that the assured did willfully set fire to the goods. The appellant cites some very eminent authority in support of its contention, among which is 5 Wigmore on Evidence, 2d ed., sections 2491 and 2511, and in a note to the latter section, the case of *State v. Wolfley,* 75 Kan. 406, 89 Pac. 1046, and on rehearing, 75 Kan. 413, 93 Pac. 337, is cited as following a slightly modified rule in harmony with some other courts. Also the very recent case of *Frankel v. New York Life Ins. Co.,* 51 F. 2d 933, is cited by appellant, but two distinct points of difference exist between that case and the one at bar. There the question was between suicide and accidental death. When substantial evidence of suicide was introduced the presumption of innocence very properly disappeared; and again, in that case, the plaintiff assumed the burden of proof, and, as it was there held, thereby waived certain errors, as stated in the opinion. If the evidence concerning the arson charged had been established with certainty, like the suicide in this case, there would have been no place for a presumption.

In the case of *Von Crome v. Travelers' Ins. Co.*, 11 F. 2d 350, cited by the appellant, the distinction is made in a few well-chosen words, as follows:

"Touching the contention of plaintiff that it was here and always is the duty of the court to charge the jury that a presumption of law existed against the fact of suicide, it is enough to say of the contention that this is sometimes true and sometimes not true. . . . In this particular case, since there was evidence, from what the insured said as to his intent to kill himself, and from the circumstances, evidence that he had killed himself, the presumption against suicide as a matter of law disappeared from the case. There was no longer any reason to invoke any presumption of law about the matter." (p. 352.)

Two Kansas cases cited by appellant, *State, ex rel., v. Creager*, 97 Kan. 334, 155 Pac. 29, and *State, ex rel., v. Woods*, 102 Kan. 499, 170 Pac. 986, are only in support of the contention of the appellant upon the theory that the defendant had established the arson in this case. In both of them it is held that the presumption exists and continues "until the contrary is established."

In the case of *O'Brien v. Insurance Co.*, 109 Kan. 138, 197 Pac. 110, the late Justice Mason clearly expressed the rule in this state, as follows:

"The existence of a presumption against suicide on the part of a sane person is generally recognized. (22 C. J. 95; 1 Enc. L. & P. 419.) The defendant, however, regards the language quoted as likely to have misled the jury by causing them to believe that the presumption against suicide should control unless the evidence proved the contrary beyond all doubt. We do not think that it is fairly open to that construction, or that there is any reasonable likelihood that it was so interpreted by the jury. The word presumption is sometimes used as a procedural term, allied to the burden of proof. The so-called presumption against suicide in such a case as the present, where the issue must be determined from circumstantial evidence—by the balancing of probabilities arising from the established facts—is perhaps better described as an inference to be drawn from the universally recognized fact that the instinctive love of life is strong in the normal person. It is a matter to be considered with others in arriving at the most probable solution to a question which cannot be determined with absolute certainty." (p. 144.)

In the case of *Mutual Life Ins. Co. v. Wiswell*, 56 Kan. 765, 44 Pac. 996, it was said—

"Where the evidence as to the death being accidental or suicidal is so nearly balanced as to leave the question in doubt, the presumption is in favor of the theory of accidental death." (Syl. ¶ 2. See, also, *National Bank v. Assurance Co.*, 33 Ore. 43.)

The instruction in this case was almost literally the same as that in the Oregon case, and substantially the same as that approved in

the O'Brien case. This instruction must, as in all other cases, be construed in connection with all the other instructions given and in particular in this case with the one preceding it, which fully informed the jury as to a preponderance of the evidence as applicable in the case on trial, carefully distinguishing between that and proof of issues beyond a reasonable doubt, where crimes are otherwise involved.

We think the instruction given on presumption of innocence is well within the rule outlined in the Kansas cases above cited, and within the distinction indicated in the cases above cited from other jurisdictions, and the giving of it was not error.

The judgment is affirmed.